FILED 20 OCT '25 14:11 USDC-ORP

Jimmie Arlyn Forbus
SID No. 4529434
Oregon State Penitentiary
2605 State St.
Salem, Oregon 97310-1346
Plaintiff, *pro se*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| JIMMIE ARLYN FORBUS, | Civil Action No. 6:25-W-1930-MO |
| Plaintiff, | **Complaint** |
| v. | **Jury Trial Demanded** |
| KAREN GAYE HARRIS, WARREN GREGORY ROBERTS, LINDA M. BONO, and JOHN/JANE DOE(S), all in their individual and official capacities, | 42 U.S.C. § 1983 with supplemental state torts of Negligence and Abuse of a Vulnerable Person |
| Defendants. | |

*Introduction*

This is a civil rights action filed by Jimmie Arlyn Forbus, an Adult in Custody[1] ("AIC"), for damages and injunctive relief under 42 U.S.C. § 1983, alleging defendants were deliberately indifferent to Plaintiff's serious medical need in violation of the Eighth Amendment to the United States Constitution. In addition, Plaintiff also alleges the state law torts of negligence and abuse of a vulnerable person.

///

---

[1] "Adult in custody" is a person incarcerated or detained in a correctional facility who is accused of, convicted of or sentenced for a violation of criminal law or for the violation of the terms and conditions of pretrial release, probation, parole, post-prison supervision or a diversion program.

Page 1 of 13 – Complaint

# 114063

Jimmie Arlyn Forbus
SID No. 4529434

*Jurisdiction*

1. The Court has jurisdiction over Plaintiff's claims of violation of his federal constitutional rights under 42 U.S.C. §§ 1331(1) and 1343.

2. The Court has supplemental jurisdiction over Plaintiff's state law tort claims under 28 U.S.C. § 1367 because they are part of the same case or controversy.

*Venue*

3. The District of Oregon is an appropriate venue under 28 U.S.C. § 1391(b)(2) because the acts and omissions giving rise to the claims occurred primarily in Marion County, Oregon. Furthermore, one or more of the defendants reside in the District of Oregon.

*Parties*

4. The plaintiff, Jimmie Arlyn Forbus ("PLAINTIFF"), during the events described herein was an AIC housed at Oregon State Penitentiary ("OSP") which was owned and operated by the Oregon Department of Corrections ("ODOC"), an agency of the state of Oregon.

5. Defendant Karen Gaye Harris ("HARRIS") was at all relevant times described herein employed by ODOC in the Health Services Section as a Correctional Physician Practitioner at OSP. She was licensed by the Oregon Medical Board as an osteopath (license number DO18948). She was PLAINTIFF's primary medical care provider as assigned by ODOC during the relevant times described herein.

6. Defendant Warren Gregory Roberts ("ROBERTS") was at all times described herein employed by ODOC in the Health Services Section as Chief of Medicine (at times titled Chief Medical Officer or Administrator). He held this position from approximately December 7, 2020, until he was placed on administrative leave in December 2024 and terminated from his position on or about February 3, 2025. Prior to being employed by ODOC as Chief of Medicine, ROBERTS had been sanctioned for unprofessional conduct by the medical boards of both Colorado and Oregon. He was licensed by the

Page 2 of 13 – Complaint

Oregon Medical Board as a physician (license number MD153449). He was a board-certified neurosurgeon with no background or training in family medicine or internal medicine. He had no training or experience providing clinical supervision of other medical doctors.

7. Defendant Linda M. Bono ("BONO") was at all times described herein employed by ODOC in the Health Services Section as a Correctional Nurse Practitioner at OSP. She was licensed by the Oregon Board of Nursing as both a registered nurse (license number 201708456RN) and nurse practitioner (license number 201708457NP-PP). She was PLAINTIFF's primary medical care provider as assigned by ODOC during the relevant times described herein.

8. John/Jane Doe(s) ("DOE(s)") are the individual(s) whose name(s) are not currently known by PLAINTIFF and who were at all relevant times described herein employed by ODOC as the "Outside Trip Scheduler(s)" responsible for timely scheduling medical appointments for AICs with third-party medical providers; and, those individuals on the TLC[2] committee who authorized or failed to authorize the medical care PLAINTIFF did and did not receive.

9. All the defendants have acted, and continue to act, under color of state law at all times relevant to this complaint.

*Background Facts*

10. Sometime around 2007, PLAINTIFF began to seek medical attention for an increase in pain and numbness in his right shoulder. The symptoms spread to his left shoulder and down his right arm. Dr.

---

[2] TLC (sometimes referred to as a "Therapeutic Levels of Care Committee") was at all time described herein a clinical review committee formed by ODOC's Health Services Chief of Medicine under authority of Or. Admin. R. 291-124-0041(4). By rule, the committee may include one or more department providers, the Medical Services Manager, and other appropriate ODOC staff. The TLC Committee review medical care and treatment requests on a case-by-case basis, with the Health Services Chief of Medicine (or designee) as the final authority in any review. Though TLC was intended by rule to provide medical review by committee, in actual practice no committee review occurred. Instead, ROBERTS based his approval decision based on his own mood and not on objective medical criteria.

Page 3 of 13 – Complaint

George Green Degner, M.D., PLAINTIFF's then medical provider assigned by ODOC, started the process of treatment that resulted in recommendation for surgery.

11. On October 25, 2017, an exam was done by Dr. William Purnell of Willamette Valley Radiology. This was referred by OSP provider Jennifer Stevens N.P. This exam showed severe injury to PLAINTIFF's right shoulder and moderate injury to his right shoulder. A surgical consultation was recommended.

12. On May 25, 2018, Ms. Stevens who was then PLAINTIFF's medical provider assigned by ODOC, submitted a TLC request for consultation and surgical repair for PLAINTIFF's shoulders. The request noted that PLAINTIFF had exhausted all conservative treatment options and that he had been complaint with all care instructions. It also noted that PLAINTIFF's injury was causing him to suffer limitations to his activities of daily living.

13. On June 10, 2019, a radiology report by Dr. William Purnell showed PLAINTIFF's shoulder issues were getting worse and newly extending into his right hand.

14. On September 16, 2020, a radiology report, this one by Dr. Blair Robers of Blue Mountain Diagnostic Imaging showed progressive pain and numbness with newly decreased range of motion.

15. On June 13, 2023, a report generated by John Gambino shows extreme pain and now a very limited range of motion due to end stage osteoarthropathy.

16. End stage osteoarthropathy, also known as end stage shoulder osteoarthritis, is a condition where the cartilage in the shoulder joint has worn away, leading to bone-on-bone friction and significant pain and functional limitations. Total shoulder replacement, also known as arthroplasty, is the generally accepted treatment in the medical community for a patient PLAINTIFF's age.

17. On June 21, 2023, HARRIS submitted a request to TLC requesting treatment for PLAINTIFF's end stage osteoarthropathy in his right shoulder. In response, a consultation with an orthopedic specialist was

Page 4 of 13 – Complaint

approved.

**First Claim for Relief** - Defendants HARRIS, ROBERTS and DOE(s) were deliberately indifferent to PLAINTIFF's serious medical need in violation of the Eighth Amendment to the United States Constitution.

18. PLAINTIFF realleges and reincorporates by reference above paragraphs 1 through 17.

19. At all relevant times described below, HARRIS and ROBERTS had reviewed PLAINTIFF's medical records and they were familiar with the facts listed in above paragraphs 10 through 17.

20. On October 6, 2023, an MRI was performed of PLAINTIFF shoulder at Salem Clinic. The MRI confirmed PLAINTIFF's shoulders were in end state osteoarthropathy.

21. On October 17, 2023, HARRIS submitted a TLC request for PLAINTIFF to obtain surgical treatment for his right shoulder. The request was approved by ROBERTS.

22. From 2021 until June of 2024, ROBERTS had a "six-month rule" in place whereby TLC approvals for AICs to receive third-party medical care expired if the AIC had not seen the third-party provider within six (6) months of the related TLC approval. ROBERTS was aware that in most instances the DOE scheduler(s) would not be able to schedule AICs within the six-month window. The result being that the ODOC medical provider would need to re-request through TLC approval—only to start the cycle over again. This cycle was a scheme by ROBERTS to delay and deny medical care to AICs, including PLAINTIFF.

23. Throughout 2023, serious problems with the scheduling by DOE scheduler(s) of out of facility trips for AICs to see third-party medical providers were brought to the attention of ROBERTS multiple times, in multiple meetings, in workplace hallway conversations and in other ways.

24. Throughout 2023, it was common at TLC for ODOC medical providers to question why out of facility trips had not been scheduled. ROBERTS never admitted that the problem was with DOE(s) scheduler(s). Instead, ROBERTS told ODOC providers attending TLC that the scheduling problems

Page 5 of 13 – Complaint

were entirely the result of the limited availability of third-party medical providers. ROOBERTS knew what he told the provider was false.

25. DOE scheduler(s) were aware that the system they operated under effectively prevented AICs including PLAINTIFF from receiving medically necessary care. DOE scheduler(s) were further aware that ROBERTS falsely represented to AICs and ODOC medical providers that the delays AICs including PLAINTIFF received were the result of the third-party medical providers. DOE scheduler(s) took no action to report to relevant authorities ROBERTS misconduct and the resulting harm to AICs including PLAINTIFF.

26. At all relevant times, HARRIS was aware of ROBERTS conduct described in above paragraphs 22 through 25. HARRIS did not report that information to PLAINTIFF. Instead, HARRIS actively participated in those schemes by ROBERTS to delay and deny care to PLAINTIFF through affirmative misrepresentations and by not taking any corrective actions.

27. At all relevant times, DOE TLC committee members were individually each aware of ROBERTS conduct described in above paragraphs 22 through 25. DOE TLC committee members did not report that information to PLAINTIFF. Instead, they each individually actively participated in those schemes by ROBERTS to delay and deny care to PLAINTIFF by not taking any corrective actions including but not limited to reporting the misconduct to the relevant authorities.

28. On or about February 2024, ROBERTS was removed as supervisior of out of facility trips.

29. Between 2017 and 2023 HARRIS and ROBERTS had definitive proof that PLAINTIFF's injuries were progressively worsening. Both doctors could have approved the surgery prior to the onset of Covid and despite the evidence that surgery was necessary both refused to actually schedule surgery which led to end state osteoarthropathy.

30. Sometime in January of 2025, ROBERTS was terminated from job as Chief of Medicine for ODOC

Page 6 of 13 – Complaint

for his knowing and intentional failures to treat AICs with serious medical needs. PLAINTIFF is among those who suffered from those failures.

31. Between October of 2023 and January of 2025, PLAINTIFF regularly communicated to HARRIS both verbally and through written correspondence that his shoulder was causing him constant, severe and debilitating pain; that he suffered limited range of motion due to the pain; that his sleep was regularly and highly disturbed by the pain; and that his activities of daily living (including the ability to put on socks and shoes, put on a shirt, wash his hair, reach up for anything, or to write) were limited because of the severe pain.

32. Sometime in January of 2025, HARRIS was placed on administrative leave by ODOC pending the outcome of an investigation into her alleged misconduct. PLAINTIFF's medical provider was then switched to BONO.

33. As a direct result of the medically unreasonable delay in treatment of PLAINTIFF's shoulder injury he has suffered permanent nerve damage in his arms and hands and upon his release from prison will be physically unable to perform work as a sheet metal fabricator which is the trade PLAINTIFF is most experienced in. As a result, PLAINTIFF will suffer loss of future earnings.

34. As of the date of the instant Complaint, PLAINTIFF has not yet received surgical treatment for his shoulder.

**Second Claim for Relief - Defendant BONO was deliberately indifferent to PLAINTIFF's serious medical need in violation of the Eighth Amendment to the United States Constitution.**

35. PLAINTIFF realleges and reincorporates by reference above paragraphs 1 through 17.

36. At all relevant times described below, BONO had reviewed PLAINTIFF's medical records and she was familiar with the facts listed in above paragraphs 10 through 17 and 20 through 33.

37. On July 24, 2025, an MRI was performed at Salem Clinic and on August 1, 2025, x-rays and orthopedic surgical consult were performed, also at Salem Clinic. The orthopedic specialist found, "Due

Page 7 of 13 – Complaint

to the extensive delay in treatment, shoulder repair [for PLAINTIFF] is no longer an option. A complete shoulder replacement is all that is left which will result in permanent disability [of PLAINTIFF]."

38. Between January of 2025 and the date of filing of the instant Complaint, PLAINTIFF regularly communicated to BONO both verbally and through written correspondence that his shoulder was causing him constant, severe and debilitating pain; that he suffered limited range of motion due to the pain; that his sleep was regularly and highly disturbed by the pain; and, that his activities of daily living (including the ability to put on socks and shoes, put on a shirt, wash his hair, reach up for anything, or to write) were limited because of the severe pain.

39. Between January of 2025 and the date of filing of the instant Complaint BONO took no material steps to ensure that PLAINTIFF received medically appropriate and necessary treatment for his shoulder injuries in a medically reasonable period of time.

40. PLAINTIFF realleges and reincorporates by reference above paragraph 34.

### Third Claim for Relief - State tort of Negligence.

41. PLAINTIFF realleges and incorporates by reference above paragraphs 1 through 40.

42. Defendants' knew or should have known that failing to provide medically and constitutionally adequate and appropriate treatment of PLAINTIFF's shoulder injuries would result in him experiencing severe physical and mental harm, pain and suffering.

43. The medically licensed defendants violated their duty to use that degree of care, skill, and diligence that is used by ordinarily careful medical providers in the same or similar circumstances in the community or similar community. The medically licensed defendants failed to use reasonable care in providing medical care to PLAINTIFF as alleged above.

44. Defendants' owed PLAINTIFF a higher standard of care because of the nature of incarceration. As a ward of the State, defendants managed all aspects of PLAINTIFF's health care and decided when a

Page 8 of 13 – Complaint


request for a medical service or treatment should be granted. Had PLAINTIFF been a free person, he would have sought the appropriate treatment immediately and had adequate treatment rendered. However, as an incarcerated person, when PLAINTIFF sought appropriate treatment while in Defendants' care, his pleas were unmet. Defendants' voluntarily took the custody of PLAINTIFF under circumstances such as to deprive PLAINTIFF of normal opportunities to manage his own health care and created a non-delegable duty to ensure that PLAINTIFF was given appropriate medical care while incarcerated. Defendants' did not meet their obligation to provide for "healthcare, including medical, dental, mental health care and pharmacy service, that comp[lies] with appropriate professional standards" to all AICs. Or. Admin. R. 291-124-0016(1)(c).

45. Defendants' conduct was unreasonable in light of the risk of harm to PLAINTIFF. Defendants' controlled all aspects of PLAINTIFF's medical care. PLAINTIFF's permanent damage to his shoulders could have been prevented or substantially reduced had adequate and timely medical care. Instead, defendants' unreasonably disregarded PLAINTIFF's pleas for appropriate medical care and treatment.

46. As a direct and proximate result of defendants' negligence, PLAINTIFF requires future medical care resulting in economic damages at defined by Or. Rev. Stat. § 31.705(2)(a) in an amount to be determined by a jury.

47. As a direct and proximate result of defendants' negligence, PLAINTIFF suffered and suffers substantial physical and mental harm, pain and suffering resulting in noneconomic damages at defined by Or. Rev. Stat. § 31.705(2)(b) in an amount to be determined by a jury.

48. On or about July 25, 2025, a report was issued by Falcon Correctional & Community Service, Inc. The report was commissioned by ODOC under contract number dasobo-00043880. The report was published by ODOC on the electronic tablets available for use by AICs. The report in general detailed deficiencies and wrongdoing by ODOC medical administrators. This was the first time that PLAINTIFF

Page 9 of 13 – Complaint

became reasonable aware that Defendants' were at least negligent in their medical treatment of PLAINTIFF.

49. PLAINTIFF timely and adequately provided notice under Or. Rv. Stat. § 30.275 related to the Third and Fourth Claims for Relief in the instant Complaint by commencing this action within the time limit specified by Or. Rv. Stat. § 30.275(2)(b).

**Fourth Claim for Relief - State tort of Abuse of a Vulnerable Person.**

50. PLAINTIFF realleges and incorporates by reference above paragraphs 1 through 49.

51. PLAINTIFF was born in March of 1958.

52. At all relevant times described herein PLAINTIFF was entitled to the protection of Oregon's Vulnerable Person Act, Or. Rev. Stat. 124.100 *et seq.*, because he was an elderly person within the meaning of Or. Rev. Stat. § 124.100(1)(a).

53. The conduct of HARRIS, ROBERTS and BONO in their treatment of PLAINTIFF described herein constituted *Criminal Mistreatment in the Second Degree* (Or. Rev. Stat. § 163.200).

54. The wrongful harming of PLAINTIFF by HARRIS, ROBERTS and BONO through conduct meeting the elements of *Criminal Mistreatment in the Second Degree* constituted physical abuse of a vulnerable person within the meaning of Or. Rev. Stat. § 124.105(1)(d).

55. As a result of the conduct of HARRIS, ROBERTS and BONO described herein, PLAINTIFF is entitled to economic damages for those expenses in an amount to be determined by a jury.

56. Pursuant to Or. Rev. Stat. § 124.100(2)(a), PLAINTIFF is entitled to an amount equal to three times PLAINTIFF's economic damages as described in above paragraph 55.

57. As a result of the conduct of HARRIS, ROBERTS and BONO described herein, PLAINTIFF has suffered physical pain, mental suffering, emotional distress and anguish, humiliation, inconvenience, and interference with normal and usual activities. As a result, PLAINTIFF is entitled to noneconomic

Page 10 of 13 – Complaint

damages for those expenses in an amount to be determined by a jury.

58. Pursuant to Or. Rev. Stat. § 124.100(2)(b), PLAINTIFF is entitled to an amount equal to three times PLAINTIFF's noneconomic damages described in above paragraph 57.

59. Pursuant to Or. Rev. Stat. § 124.100(2)(c) PLAINTIFF is entitled to recover reasonable attorney fees in bringing his claim.

*Exhaustion of Administrative Remedies*

60. PLAINTIFF has exhausted his administrative remedies with respect to all claims and all defendants. In the alternative, PLAINTIFF was an is excused from exhausting his administrative remedies because they were not available to him.

*Relief Requested*[3]

**Wherefore**, PLAINTIFF prays for judgment against defendants as follows:

### First Claim for Relief – Deliberate Indifference
### (Against defendants HARRIS, ROBERTS and DOE(s))

A. Award compensatory damages against HARRIS, ROBERTS and DOE(s) jointly and severally, in a fair amount to be determined by a jury;

B. Award punitive damages against HARRIS, ROBERTS and DOE(s) each individually, in a fair amount to be determine by a jury;

C. Award equitable relief in an amount to be determined by a jury; and,

D. Grant such other relief as it may appear PLAINTIFF is entitled.

### Second Claim for Relief – Deliberate Indifference
### (Against defendant BONO)

E. Award compensatory damages against BONO and DOE(s) jointly and severally, in a fair amount to

---

[3] All compensatory, punitive, economic and noneconomic relief requested is against defendants in their individual capacities. All equitable relief requested is against defendants in their official capacities.

Page 11 of 13 – Complaint

be determined by a jury;

F. Award punitive damages against BONO and DOE(s) each individually, in a fair amount to be determine by a jury;

G. Award equitable relief in an amount to be determined by a jury; and,

H. Grant such other relief as it may appear PLAINTIFF is entitled.

### Third Claim for Relief – Negligence
### (Against defendants HARRIS, ROBERTS, BONO and DOE(s))

I. Award economic damages in an amount to be determined by a jury that fairly and justly compensates PLAINTIFF his past and future expenses he has and will incur as a result of defendants' wrongful acts and omissions;

J. Award noneconomic damages in an amount to be determined by a jury that fairly and justly compensates PLAINTIFF for physical pain, mental suffering, emotional distress and anguish, humiliation, inconvenience, and interference with normal and usual activities that PLAINTIFF suffered from defendants' wrongful acts and omissions;

K. Award equitable relief in an amount to be determined by a jury; and,

L. Costs and disbursements incurred herein.

### Fourth Claim for Relief – Abuse of a Vulnerable Person
### (Against defendants HARRIS, ROBERTS, BONO and DOE(s))

M. Award economic damages in an amount to be determined by a jury that fairly and justly compensates PLAINTIFF for his past and future expenses he has and will incur as a result of defendants' wrongful acts and omissions;

N. Treble economic damages pursuant to Or. Rev. Stat. § 124.100(2)(a);

O. Award noneconomic damages in an amount to be determined by a jury that fairly and justly compensates PLAINTIFF for physical pain, mental suffering, emotional distress and anguish,

Page 12 of 13 – Complaint

humiliation, inconvenience, and interference with normal and usual activities that PLAINTIFF suffered from defendants' wrongful acts and omissions;

P.  Treble noneconomic damages pursuant to Or. Rev. Stat. § 124.100(2)(b);

Q.  Award equitable relief in an amount to be determined by a jury;

R.  Reasonable attorney fees pursuant to Or. Rev. Stat. § 124.100(2)(c); and,

S.  Costs and disbursements incurred herein.

DATED October 13, 2025.

Respectfully Submitted,

*/s/ Jimmie A. Forbus*
Jimmie Arlyn Forbus
Plaintiff, *pro se*

## VERIFICATION

**Pursuant to 28 U.S.C. § 1746, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on October 13, 2025.

*/s/ Jimmie A. Forbus*
Jimmie Arlyn Forbus
Plaintiff, *pro se*

Oregon Department of Corrections - AIC Mail

Institution: OSP
Name: Jimmie Forbus  SID: 4529434
Address: 2605 State St.
City: Salem   Oregon   ZIP: 97310



10/15/2025
US POSTAGE $002.44
ZIP 97310
041M11470048

PRIORITY LEGAL

United States District Court
Office of the Clerk
District of Oregon
740 United States Courthouse
1000 SW Third Ave.
Portland, Oregon 97204-2902

Postage Paid